**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 13-252 |
| | ) | |
| MICHAEL JONES, | ) | |
| Defendant. | ) | |

## OPINION

CONTI, Chief District Judge

## I.    INTRODUCTION

This opinion addresses two pretrial motions filed by defendant Michael Jones ("Jones"): (1) a motion to suppress evidence (ECF No. 919), and (2) a motion to sever counts under Federal Rule of Criminal Procedure 8 or 14. (ECF No. 915.) Jones is charged with conspiracy and individual drug-trafficking and firearms offenses. *See* (ECF No. 705 (second superseding indictment).)

In his suppression motion, Jones argues law enforcement agents violated his Fourth Amendment rights by searching his home without a search warrant or his voluntary consent after arresting him there pursuant to a lawful arrest warrant. He seeks to suppress the evidence gathered during the search. On December 17, 2015, the government filed a response to Jones's suppression motion. *See* (ECF No. 1040.) On January 14, February 1, and February 17, 2016, the court held a three-day evidentiary hearing on Jones's motion during which the parties examined

witnesses and entered exhibits into evidence. (ECF Nos. 1083, 1107, 1108.) On May 2 and 3, 2016, the parties filed proposed findings of fact and conclusions of law. (ECF Nos. 1138, 1143.) On May 18 and 20, 2016, Jones and the government filed replies. (ECF Nos. 1156, 1158.)

In his severance motion, Jones argues for a trial of the conspiracy drug-trafficking charge separate from the individual drug-trafficking and weapons charges set forth in the second superseding indictment. (ECF No. 915.) On December 17, 2015, the government filed a response to Jones's severance motion. *See* (ECF No. 1040.) On May 2, 2016, the government filed a supplemental response to Jones's severance motion. (ECF No. 1139.)

Fully briefed, Jones's motions are ripe for disposition. Because the government proved by a preponderance of the evidence that Jones voluntarily consented to the searches of his home on February 26, 2014, the court will deny his suppression motion. Because a joint trial of the conspiracy drug-trafficking charge and the individual drug-trafficking and weapons charges—which are not temporally connected to the conspiracy charge—would prejudice Jones, the court will grant his severance motion.

The court makes the following findings of fact[1] and conclusions of law.

---

[1] For purposes of a motion to suppress, the court "may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679 (1980); *Brosius v. Warden*, 278 F.3d 239, 246 (3d Cir. 2002) ("Hearsay may

## II.  FINDINGS OF FACT

### A.  Background about Jones

**1.**     At all relevant times, Jones was 32 years old.  *See* (ECF No. 1108 at 3; ECF No. 1083 at 57.)

**2.**     Jones is a lifelong resident of the Western District of Pennsylvania. (ECF No. 528 at 4.)[2]

**3.**     Jones attended and graduated from the Everest Institute in Pittsburgh with an associate's business degree.  (*Id.*)

**4.**     At the time of this arrest, Jones was self-employed as a landlord.  (*Id.* at 4–5.)  He owned five properties, including his personal residence.  (*Id.* at 5.) From 2006 to 2011, Jones worked for Anago Janitorial Services.  (*Id.*)

**5.**     Jones's interaction with the criminal justice system began when he was 15 years old.  (*Id.*)  As a minor, he was adjudicated delinquent for several

---

be considered in a suppression hearing in a federal court." (citing *Raddatz*, 447 U.S. at 679)).

[2]   On June 3, 2014, the court held a detention hearing at which it affirmed the magistrate judge's denial of Jones's May 1, 2014 motion for release on bail pending trial.  (Text Minute Entry, 6/3/2014.)  Jones did not appeal the court's decision.  On August 15, 2014, the court issued a memorandum opinion explaining why it affirmed the denial of Jones's motion for release.  (ECF No. 528.)  The materials upon which the court relied to reach its decision are part of this case's record.  Accordingly, the court takes notice of those materials in reviewing this motion to suppress evidence.  *See, e.g.*, *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1034 (C.D. Cal. 2015) ("It is well established that a court can take judicial notice of its own files and records under Rule 201 of the Federal Rules of Evidence."); *Breyer v. Meissner*, 23 F. Supp. 2d 521, 527 (E.D. Pa. 1998) ("A court may 'take judicial notice, whether requested or not . . . of its own records and files, and facts which are part of its public records.'" (quoting *United States v. Jackson*, 640 F.2d 614, 617 (8th Cir. 1981))), *rev'd on other grounds*, 214 F.3d 416 (3d Cir. 2000).

offenses related to illegal narcotics and firearms. *See* (*id.* (describing these offenses in detail).)  As an adult—and prior to the instant arrest—Jones was convicted of a state felony involving illegal narcotics and several other offenses. *See* (*id.* at 5–6 (describing these offenses in detail).)

**B.**   **Background about Jones's family and residence**

**6.**   In February 2014, Jones resided at 1012 Leishman Avenue in New Kensington, Pennsylvania.  (ECF No. 1108 at 3.)

**7.**   Jones resided at that address with his longtime girlfriend Trina Andrews ("Andrews"), their five children (ages 14, 12, 10, 3, and 6 months), and his nephew, Robert Best ("Best") (age 17).  (*Id.* at 5–6; ECF No. 1107 at 5–6.)

**8.**   Jones's and Andrews's 6-month-old son, "MJ," was born premature and required an oxygen machine.  (ECF No. 1107 at 7.)

**9.**   1012 Leishman Avenue was a two-story, single-family residence with a basement, an attic, and a backyard with a parking area near a rear alleyway.  *See* (ECF No. 1083 at 57.)  The home did not have an open floorplan; it had "walls separating rooms."  (*Id.* at 61.)  The home's approximate first-floor layout is depicted below:



*See* (Def.'s Exs. B, C (derived from Jones's not-to-scale drawings of the first-floor layout of 1012 Leishman Avenue received into evidence at the suppression hearing).)

C.     **The execution of the arrest warrant**

**10.**     On February 25, 2014, a federal grand jury returned a superseding indictment in this case charging Jones with conspiracy to possess with intent to distribute and distribute five kilograms or more of cocaine, 500 grams or more of methamphetamine, and one kilogram or more of heroin, from in and around January 2011 to in and around September 2013. (ECF No. 228.)

**11.**     In total, the superseding indictment named twenty-one codefendants, including Jones, Luis Carde ("Carde"), Rhionna Rhodes ("Rhodes"), and Justin Silvio ("Silvio"). (*Id.*)

**12.**     Detective William Flaherty ("Detective Flaherty") of the Allegheny County District Attorney's Office was a task force officer and case agent involved throughout the investigation of Jones and his codefendants by the Drug Enforcement Administration ("DEA"). (ECF No. 1083 at 55, 69–70.) Detective Flaherty participated personally in investigating Jones and his codefendants through, among other things, wiretaps of Jones's codefendants' cellular telephones. (*Id.*)

**13.**     On February 26, 2014, the court issued a warrant for Jones's arrest based upon the charge in the first superseding indictment. (ECF No. 237.)

**14.**     On that date, the temperature in the area near Jones's home was below freezing. *See* (ECF No. 1083 at 150–51; ECF No. 1107 at 17–18; ECF No. 1108 at

27, 87.)

**15.** At 6:30 a.m. on February 26, 2014, Detective Flaherty met with ten officers from the DEA, the district attorney's office, and the New Kensington Police Department in a parking lot to "brief on the service of [Jones's] arrest warrant" at 1012 Leishman Avenue. (ECF No. 1083 at 56; ECF No. 1040-1 at 1 (DEA post-arrest report).)

**16.** At that time, Detective Flaherty was aware that Jones had been convicted of a prior felony for narcotics trafficking. (ECF No. 1083 at 56–57.) One of the New Kensington police officers was familiar with Jones and "had several dealings" with him "in [the] past." (ECF No. 1040-1 at 1; ECF No. 1083 at 56.)

**17.** The officers did not have a warrant to search any part of 1012 Leishman Avenue. (ECF No. 1083 at 75.)

**18.** At around 6:55 a.m., Detective Flaherty and the other officers arrived at Jones's home to execute the arrest warrant. (*Id.* at 58; ECF No. 1040-1 at 2.) Several of the officers arrived in marked police vehicles with their emergency lights activated. (ECF No. 1083 at 58; ECF No. 1040-1 at 2.)

**19.** When the officers arrived at the residence, Jones and Andrews were asleep with MJ in the master bedroom on the second floor of the home. (ECF No. 1107 at 7.) Jones's and Andrew's four other children were asleep in rooms on the

second floor and in the attic.  (ECF No. 1108 at 7.)  Best was asleep in a room in the attic.  (*Id.* at 76.)

**20.** The officers proceeded to the front and back doors of Jones's home. (ECF No. 1083 at 58.)

**21.** At around 6:58 a.m., Detective Flaherty knocked loudly on the front door of Jones's home and announced the officers' presence.[3] *See* (*id.*; ECF No. 1040-1 at 2.)

**22.** Detective Flaherty's knocking awoke Jones and Andrews.  (ECF No. 1107 at 7; ECF No. 1108 at 4.)

**23.** In response to Detective Flaherty's knocking, Jones "jumped out of bed," "threw on shorts," and looked through an upstairs window, where he saw police vehicles in front of his home.  (ECF No. 1108 at 4.)  He opened his bedroom door, spoke briefly to one of his daughters in the hallway, and proceeded down the stairs to the first floor of the home.  (*Id.* at 4–5.)

**24.** Outside the home, the officers saw Jones look through the upstairs window and verified his identity at around 6:59 a.m.  (ECF No. 1083 at 58–59; ECF No. 1040-1 at 2.)

---

[3] In his suppression motion—but not in his proposed findings of fact and conclusions of law, (ECF No. 1143)—Jones argued that the officers did not knock and announce their presence, in violation of the Fourth Amendment.  "[P]olice officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry."  *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997).  In this case, the record is clear that the officers knocked on Jones's front door and announced their identity prior to their entry.  Suppression is, therefore, not warranted on these grounds.

**25.** Approximately one minute later, Detective Flaherty led several other officers in forcing entry into Jones's home through the front door with their firearms drawn. *See* (ECF No. 1083 at 59, 82.)

**26.** Upon entry, Detective Flaherty observed Jones "approximately halfway down the steps" and ordered him at gunpoint "to come down the stairs" and "lie on his stomach" near the front door. (*Id.* at 59; ECF No. 1040-1 at 2.)

**27.** Jones complied with Detective Flaherty's orders without verbal or physical confrontation and was taken into custody at the bottom of the stairs near the front door. (ECF No. 1083 at 59, 82.) At that point, Detective Flaherty "holstered [his] firearm" to "place handcuffs" on Jones. (*Id.* at 61.)

**28.** Andrews came down the stairs after Jones, and the officers ordered her to restrain the family's pit bull dog, which was barking near the front door. (ECF No. 1107 at 8, 11; ECF No. 1108 at 5.) Andrews complied and took the pit bull from the dining room downstairs to the basement. (ECF No. 1107 at 8; ECF No. 1108 at 5, 9, 11.)

**29.** Once Jones was handcuffed on the ground near the front door, Detective Flaherty and DEA Agent Michael Johns ("Agent Johns") picked Jones up and walked him from the front entryway to the kitchen at the back of the home. (ECF No. 1083 at 60; ECF No. 1108 at 11.)

**30.** As Detective Flaherty and Agent Johns moved Jones to the kitchen,

the other officers conducted a "protective sweep" throughout the home "looking for . . . anybody that [*sic*] could cause any danger" to the officers. (ECF No. 1083 at 86–89.)

**31.**     The protective sweep took "approximately a few minutes" following the forced entry into Jones's home. (*Id.* at 90.)

**32.**     During the protective sweep, an unidentified officer entered Best's room in the attic with his gun drawn and ordered Best to come downstairs to the first floor. (ECF No. 1108 at 76–79.) Best complied and went downstairs to the living room area where Andrews and the five other children had already gathered. (*Id.*) Near the living room, Best asked an unidentified officer if he could go back to the attic to dress in warmer clothes. (*Id.* at 87–88.) The officer responded, "just tell me the location and I will get [the clothes] for you." (*Id.*) Best explained the location of the warmer clothes to the officer, who went upstairs to the attic and retrieved them for him. (*Id.*)

**33.**     After Detective Flaherty and Agent Johns moved Jones from the front entryway into the kitchen and during the protective sweep, Agent Johns searched Jones's pockets and recovered an Apple iPhone and $3,140.00 in cash. (ECF No. 1040-1 at 2; ECF No. 1108 at 12–13; ECF No. 1083 at 154.) Detective Flaherty then advised Jones that he had been indicted for a drug conspiracy offense. (ECF No. 1040-1 at 2; ECF No. 1083 at 61.) The officers took "a few minutes" to

document and catalogue the items found on Jones's person. (ECF No. 1083 at 154.)

### D. The initial search and recovery of three firearms

**34.** After Agent Johns recovered the phone and cash from Jones's pockets and during the protective sweep, Detective Flaherty asked Jones for consent to "[s]earch the residence" in the kitchen. (ECF No. 1040-1 at 2; ECF No. 1083 at 61–62.) Detective Flaherty's first consent request came "[l]ess than five minutes [*sic*]" after the officers forced entry into Jones's home. *See* (ECF No. 1083 at 62, 105–06.) At that time, Jones was handcuffed and seated on a footstool in the kitchen with several officers around him (ECF No. 1108 at 13), but the atmosphere was calm throughout the interaction. *See* (ECF No. 1083 at 68.) At that time, Jones had not been read "any rights in terms of the right to remain silent" or the "right to have counsel present." (ECF No. 1108 at 15; ECF No. 1083 at 127.)

**35.** In response to Detective Flaherty's question, Jones told the officers there were firearms in his home that were "allowed" to be there. (ECF No. 1083 at 62; *see* ECF No. 1108 at 13.)[4] Detective Flaherty asked Jones where the firearms were, and Jones responded by describing the particular locations of three firearms within his home. *See* (ECF No. 1108 at 13–14; ECF No. 1083 at 61–63.)

---

[4] As explained in detail at Conclusion of Law 25, *infra*, Detective Flaherty's and Jones's testimony differs about the details of this exchange, but Jones's testimony corroborates Detective Flaherty's in all relevant respects.

Specifically, Jones "advised [Detective Flaherty] that there was [one] firearm in the dining room closet," a "rifle in the upstairs master bedroom closet," and "another gun in the top dresser drawer in the same upstairs bedroom." (ECF No. 1040-1 at 2.) Detective Flaherty told Jones, "we would like to secure the firearms," and Jones "agreed." (ECF No. 1083 at 62.)

36. After the protective sweep ended, the officers recovered the three firearms Jones described. An officer recovered a handgun from a shelf in the dining room closet next to the kitchen, as Jones had described. *See* (ECF No. 1083 at 62–63, 88–89, 102–04.) The pistol was "loaded with a chambered 9mm round and a magazine containing [thirteen] live 9mm rounds." (ECF No. 1040-1 at 2.)

37. Detective Flaherty and Agent Johns "went upstairs" and recovered a "SKS assault style rifle from the master bedroom closet," as Jones had described. (ECF No. 1083 at 63, 88–89. 102–04.) The rifle was "loaded with a chambered 7.62 caliber round and a clip containing [sixteen] live 7.62 caliber rounds." (ECF No. 1040-1 at 2–3.) At that time, the officers observed a "bulletproof vest" next to the rifle in the closet. (ECF No. 1083 at 129.)

38. Detective Flaherty and Agent Johns recovered a "semi-automatic pistol from the left drawer of a long dresser" in the upstairs master bedroom, as Jones had described. (ECF No. 1083 at 63, 88–89, 102–04.) The pistol was "loaded with a chambered .45 caliber round and a magazine containing [seven] live

.45 caliber rounds." (ECF No. 1040-1 at 3.) At that time, Agent Johns "observed a knotted plastic baggie" of marijuana "next to the firearm" recovered from the dresser drawer. (*Id.*; ECF No. 1083 at 63.) Detective Flaherty also "observed a Triton digital scale, a box of 'Glad' sandwich bags[,] and a Samsung cellular phone" on top of the dresser. (ECF No. 1040-1 at 3.) Finally, Detective Flaherty observed the handle of a fourth handgun protruding from the pocket of a jacket hanging over the master bedroom door. (ECF No. 1083 at 128–29.)

**39.** Detective Flaherty and the officers seized the three firearms Jones told them about; they did not seize the marijuana, the scale, the bags, the cell phone, the body armor, or the fourth handgun at that time. (*Id.* at 63.)

### E. <u>The second search after Jones signed the consent form</u>

**40.** While Detective Flaherty and Agent Johns were upstairs recovering the pistol and rifle to which Jones had directed them, an unidentified officer suggested to Jones in the kitchen that he could be "facing a lot of time with [this] conspiracy charge," he could be away from his children, and this was Jones's "only time" to "help [himself] out." (ECF No. 1108 at 14–15.) Jones told the officer he did not "know anything." (*Id.*) Jones testified that he did not "want to say it was an attempt to scare [him]," but the officer "was informing [him] of the time [he] could be facing and how long [he would] be away from [his] kids." (*Id.* at 15.) Jones did not testify that any officer pointed a weapon at him while he was in the

kitchen. (*Id.* at 11–13.)

**41.** After this interaction in the kitchen, Jones told the unidentified officers "that the kitchen was the coldest room in [the] house" and "asked them" if they would "take [him] out of that room." (*Id.* at 15.) The unidentified officers granted Jones's request, moved him from the kitchen into the dining room, and sat him down in a chair at the dining-room table. *See* (*id.* at 16.)

**42.** Once seated in the dining room, Jones saw and could hear Andrews and his five children in the living room. (*Id.* at 17.) At that time, Best was also in the living room. (ECF No. 1107 at 12–13.) Best testified that no officers were present with the family in the living room. (ECF No. 1108 at 80.)

**43.** After Jones was taken out of the kitchen and into the dining room, Andrews asked an unidentified officer in the living room, "[can] I go make my baby a bottle?" (ECF No. 1107 at 14.) The officer granted Andrews's request, "walked" her into the kitchen, "let [her] make" the bottle for MJ, and walked her back into the living room. (*Id.* at 14–16.) As she went into the kitchen, Andrews "walked past" Jones, who was in the dining room. (*Id.* at 15.) "About [twenty] minutes" had passed from the time Detective Flaherty first knocked on Jones's front door to the time Andrews was escorted into the kitchen to prepare MJ's bottle. (*Id.* at 16.)

**44.** After recovering the pistol and rifle to which Jones had directed him

in the master bedroom upstairs, Detective Flaherty came downstairs and suggested to Jones in the dining room that he failed to inform the officers about the fourth handgun observed in the jacket hanging over the master bedroom door. (ECF No. 1083 at 128; ECF No. 1108 at 19.) Detective Flaherty then asked Jones for consent to search the residence again. *See* (ECF No. 1083 at 63.)

**45.** Following this request for consent, Detective Flaherty and Jones discussed how Jones kept an engagement ring in a locked safe in the master bedroom that he did not want the officers to seize. (*Id.* at 64; *see* ECF No. 1108 at 19.) Detective Flaherty told Jones that the officers would not seize the ring. (ECF No. 1083 at 64; *see* ECF No. 1108 at 19.) Following this discussion, Jones suggested to Detective Flaherty that he would acquiesce to a search of the residence. (ECF No. 1083 at 64.)

**46.** Following Jones's verbal indication of consent, Detective Flaherty presented Jones with a "DEA 88" consent form in the dining room, told him to read it, and asked him to "let [him] know" if he had any questions about the form. (*Id.*) The officers removed Jones's handcuffs to allow him to read and sign the form. (*Id.* at 152–53.)

**47.** The consent form provided the following:

1.      I have been asked to permit special agents of the [DEA] to search . . . 1012 Leishman Avenue . . . [.]

2.      I have not been threatened, nor forced in any way.

3.　　　I freely consent to this search.

(ECF No. 1040-2.)  The form was dated February 26, 2014.  (*Id.*)

　　**48.**　　　Jones read the consent form.  (ECF No. 1083 at 65–66; ECF No. 1108 at 23.)

　　**49.**　　　Jones testified that after reading the consent form, he stated, "unless you get my lawyer on the phone and he says it's okay for me to sign it, then I'm not signing anything else."  (ECF No. 1108 at 23.)  Detective Flaherty did not hear Jones make this statement.  (ECF No. 1083 at 107.)  Jones testified that an unidentified officer replied to him that "if we have . . . to get your lawyer on the phone, then we will get our lawyer on the phone," and "while we wait for our lawyer to get the search warrant, we will sit your family outside."  *See* (ECF No. 1108 at 23, 81; ECF No. 1107 at 16–17.)[5]  Detective Flaherty did not hear any officer make this statement.  (ECF No. 1083 at 66–67, 107.)  Jones testified that he replied to the unidentified officer, "you can't do that."  (ECF No. 1108 at 23.)  The unidentified officer responded, "we can and we will."  (*Id.*)  Jones stated, "you're really going to sit my family outside?"  (*Id.*)  The officer replied, "try us."  (*Id.*)

---

[5]  From the living-room area, Andrews and Best testified that they heard an unidentified officer suggest to Jones that if he did not sign the consent form, his family would be "sat" outside the home.  (ECF No. 1107 at 16–17 (Andrews testifying that the unidentified officer stated, "if you don't sign this paper right now, I am going to have your family set outside," to which Jones replied, "you can't do that"); ECF No. 1108 at 81 (Best testifying that the unidentified officer "told [Jones] if he wouldn't sign this paper, . . . he would make everybody sit outside . . . and they would search the house, and that was all").)

Jones replied, "damn, that's fucked up," and "signed the consent form."[6] (*Id.* at 23, 59–60; ECF No. 1040-2 (DEA consent form showing Jones's signature).)

**50.**    Detective Flaherty and Agent Johns signed the consent form as witnesses.  (ECF No. 1040-2; ECF No. 1083 at 65.)

**51.**    Jones was not suffering from any observable "medical issues" when he signed the consent form.  (ECF No. 1083 at 69.)

**52.**    Jones did not make "any request . . . for food or drink" that the officers denied before he signed the consent form.  (*Id.*)

**53.**    Jones did not testify that any of the officers brandished or pointed a

---

[6] Detective Flaherty testified that he contacted every officer involved in the February 26, 2014 arrest of Jones and asked whether they threatened or heard another officer threaten to "sit" Jones's family outside if he did not consent to a search.  *See* (ECF No. 1108 at 92–95.) According to Detective Flaherty, each officer denied making or hearing another officer make these statements to Jones.  (*Id.* at 92–95, 101–02 (characterizing Jones's accusation as "funny" and "insane").)  For purposes of this opinion, however, the court will assume that Jones heard an unidentified officer make these statements—or statements of this nature—because (1) Detective Flaherty was not present with Jones in the kitchen and dining room for the entire incident, (2) his testimony about the other officers' statements was hearsay and, thus, less probative, and (3) Andrews and Best corroborated Jones's version of the story about the statements.

The government correctly points out that Andrews and Best inconsistently described the appearance of the unidentified officer who made the statements about "sitting" Jones's family outside.  *See* (ECF No. 1138 ("[B]est described the officer who interacted with [Jones] in the supposedly threatening manner as short, white, with spiky hair . . . .  This description is not consistent with the description provided by [Andrews] of white, with dark hair, and big and tall." (citing their testimony)).)  These inconsistencies are, however, insufficient to support a finding that the totalities of their testimonies were false.

Detective Flaherty testified that "someone there told [him] there were" only "three kids" in the home on the day of Jones's arrest.  (ECF No. 1083 at 105.)  The record is clear, however, that there were six children present in the home: Jones's five children and Best.  Jones asserts that this undercuts Detective Flaherty's credibility and ability to recall the events of February 26, 2014.  The court does not find that this undercuts the totality of Detective Flaherty's testimony, and in any event, the court assumes, in its analysis, that the statements about "sitting" Jones's family outdoors were made.

firearm at him during this interaction.  *See* (ECF No. 1108 at 23.)

54.    While Jones was "clearly not happy," "he was respectful" to the officers and "[e]verything was calm."  (ECF No. 1083 at 68.)  Overall, "[i]t was a pretty calm interaction" without "yelling or screaming by [the officers]."  *See* (*id.*; ECF No. 1108 at 23.)

55.    "Approximately [twenty] minutes" to an hour elapsed between the time the officers forced entry into Jones's home and the time Jones signed the consent form.  (ECF No. 1083 at 66, 127.)

56.    After Jones signed the consent form, the officers searched 1012 Leishman Avenue.  *See* (ECF No. 1040-1.)

57.    During the search, the officers seized:

- the 9mm handgun observed in the jacket pocket hanging over the master bedroom door;

- the body armor vest observed in the master bedroom closet next to the rifle;

- a fifth handgun located in the master bedroom closet;

- several boxes of miscellaneous ammunition located on a shelf in the master bedroom closet;

- two knotted plastic bags containing about 7 grams of cocaine (one located on top of the master bedroom dresser and the other located next to the pistol Jones directed the officers to in the master bedroom dresser);

- the knotted plastic bag containing marijuana observed next to

the pistol in the master bedroom dresser;

- the box of "Glad" sandwich bags on top of the long dresser in the master bedroom;

- the digital scale on top of the long dresser in the master bedroom; and

- three additional cellular telephones found throughout the residence.

*See* (ECF No. 1040-1.)

**58.** In addition, the officers recovered two letters from codefendant Rhodes to Jones on the dresser in the master bedroom. (*Id.* at 4.) In part, one of Rhodes's letters read:

> I know you know what's going on. The whitey told them everything he knew. I wouldn't even be involved in this shit if I didn't try to go handle shit for y'all. I'm not on no wiretaps. They ain't find shit in my house. All they got is him saying I came to him for other people and they want to know who. I have been in jail two months and my whole life has been a mess behind me not telling. You can get at my mom, you can have Yolanda call her or whatever, but something gotta shake because I'm looking at 120 months for nothing. They have nothing on me except him.

(ECF No. 454-3.)

**59.** While at Jones's residence, Detective Flaherty observed a black 1999 Acura coupe parked on the rear of Jones's property. (ECF No. 1040-1 at 4.) During the search of the master bedroom after Jones signed the consent form, the officers found the keys to this vehicle in Jones's dresser. (ECF No. 1083 at 143.) From the DEA investigation, Detective Flaherty knew the vehicle was registered to

codefendant Silvio and purchased by codefendant Carde. (ECF No. 1040-1 at 4.) Detective Flaherty knew the vehicle contained a hidden compartment. (*Id.*) The vehicle was searched, and two hidden compartments were found. (*Id.*)

**60.** The search of 1012 Leishman Avenue concluded at 9:45 a.m., and the officers left the scene. (*Id.* at 5.) Approximately two hours and forty-seven minutes elapsed from the time the officers knocked on Jones's front door (*i.e.*, 6:58 a.m.) to the time they left the home. *See* (*id.*; Finding of Fact 21.)

**61.** Throughout the execution of the arrest warrant, Detective Flaherty and the other officers were concerned about safety and took precautions to ensure their own safety and the safety of the occupants of the home. *See* (ECF No. 1083 at 85–89, 102–05, 109, 121.)

**F.** **The new charges against Jones stemming from the February 26, 2014 searches of his home**

**62.** On February 10, 2015, a federal grand jury returned a second superseding indictment in this case charging Jones with the original conspiracy offense from in and around January 2011 to in and around September 2013 and three additional offenses stemming from the February 26, 2014 searches. *See* (ECF No. 705.) The three additional charges are (1) possession with intent to distribute quantities of cocaine base and cocaine on or about February 26, 2014, (2) possession of firearms in furtherance of a drug-trafficking crime on or about February 26, 2014, and (3) possession of firearms by a convicted felon on or about

February 26, 2014. (*Id.*)

63.    On July 21, 2015, Jones filed this motion to suppress the evidence gathered during the February 26, 2014 searches of his home. (ECF No. 919.)

## III.    CONCLUSIONS OF LAW FOR JONES'S SUPPRESSION MOTION

1.    Jones argues for suppression of the evidence recovered from his home on February 26, 2014 under the Fourth Amendment. Specifically, he contends that the officers did not possess a search warrant for his home and he did not consent voluntarily to either the first search for the three firearms or the second search after he signed the consent form.

2.    For the reasons that follow, the government proved by a preponderance of the evidence that Jones voluntarily consented to both searches occurring in this case. Jones's suppression motion will be denied. His arguments for suppression are addressed below after a brief explanation of the Fourth Amendment and the consent exception to the warrant requirement.

### A.    The Fourth Amendment and the consent exception to the warrant requirement

3.    In pertinent part, the Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. CONST. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250

(1991); *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) ("[T]he Fourth Amendment does not prohibit all searches—only those that are unreasonable." (citing *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990))).

4.      By a preponderance of the evidence, the government must prove that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *See United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). Evidence obtained from an unreasonable search must be suppressed as "'fruit of the poisonous tree.'" *See, e.g.*, *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

5.      Under the Fourth Amendment, "'[c]onsent is an exception to the requirements of both a warrant and probable cause.'" *United States v. Murray*, — F.3d —, No. 15-2054, 2016 WL 1697082, at *3 (3d Cir. Apr. 28, 2016) (quoting *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011)). The Supreme Court has "'long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.'" *Price*, 558 F.3d at 277–78 (quoting *Jimeno*, 500 U.S. at 250–51).

6.      To justify a warrantless search based upon consent, the government must prove by a preponderance of the evidence that the "'consent was, in fact, freely and voluntarily given.'" *Id.* (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). "This burden 'is not satisfied by showing a mere submission to a

claim of lawful authority.'" *Id.* at 278 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). For consent to be voluntary, it cannot be the "product of duress or coercion, express of implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

      **7.**    "There is 'no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen.'" *Price*, 558 F.3d at 277–78 (quoting *Schneckloth*, 412 U.S. at 224). Instead, the court determines the voluntariness of consent "by examining the totality of the circumstances." *Id.* (citing *Schneckloth*, 412 U.S. at 227). Consent can be either express or implied,[7] and "the standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—[*i.e.*,] what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251; *United States v. Wilson*, 914 F. Supp. 2d 550, 565 (S.D.N.Y. 2012) (citing *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995)).

      **8.**    "Both 'the characteristics of the accused and the details of the interrogation' are useful to determine whether, under all the circumstances, a consent to search was voluntary, and no case should 'turn . . . on the presence or absence of a single controlling criterion.'" *Price*, 558 F.3d at 277–78 (quoting

---

[7] Jones discusses the doctrine of implied consent in his proposed findings of fact and conclusions of law. (ECF No. 1143 at 21.)

*Schneckloth*, 412 U.S. at 226). "Factors to consider include: the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." *Id.* (citing *Schneckloth*, 412 U.S. at 226). The United States Court of Appeals for the Third Circuit "further identifie[s] as relevant 'the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions.'" *Id.* (quoting *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003)).

### B. Whether the officers violated Jones's Fourth Amendment rights

**9.**     Jones contends that the officers' legal right to remain in his home expired immediately following his arrest and the protective sweep. Instead of leaving after the arrest, Jones argues that the officers remained in his home for three hours to seek his consent to a search, in violation of the Fourth Amendment. Jones contends he did not consent to the first search for the three firearms and that the officers coerced him to sign the consent form for the second search.

**10.**     The court concludes that it was reasonable in the interest of safety for the officers to remain in the home after Jones was arrested and during the protective sweep. Contrary to Jones's assertions, the preponderance of the evidence shows that (1) within approximately five minutes after police forced entry into Jones's home, he voluntarily consented to the first search, and (2) within

approximately twenty minutes to an hour after the forced entry, he voluntarily consented to the second search that took place in this case. These conclusions are explained in detail below.

### 1. Whether it was reasonable for the officers to remain in Jones's home after his arrest and during the protective sweep

**11.** Jones argues that because the officers did not have a search warrant for the premises, they were required to leave his home *immediately* after completing his arrest near the front entryway inside his residence. This argument is without merit.

**12.** First, Jones does not—and cannot—dispute that the officers lawfully entered his home to execute the arrest warrant in this case.

**a.** "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe [he] is within." *Payton v. New York*, 445 U.S. 573, 585–86 (1980).

**b.** Here, Jones does not dispute that probable cause supported the arrest warrant and the officers' belief that he lived in and was present at his home. *See id.* The officers verified Jones's identity when he looked at them through an upstairs window prior to the forced entry. *See* (Finding of Fact 24); *United States v. Agnew*, 407 F.3d 193, 196 (3d Cir.

2005) ("[T]he police had probable cause to believe that Agnew was in the home because they saw him through the window." (citing *Payton*)). The arrest warrant in this case "implicitly carrie[d] with it the limited authority" for the officers "to enter" Jones's home to carry out his arrest. *See Payton*, 445 U.S. at 602–03; *Agnew*, 407 F.3d at 196.

13.     Second, Jones does not challenge the legality of the officers' protective sweep of his home that took place as he was taken into custody near the front door.

  **a.**  A protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers and others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). The sweep is limited to searches of "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. If the sweep goes beyond that area, there must be "articulable facts" warranting "a reasonably prudent officer" in believing that the area "harbors an individual posing a danger to those on the arrest scene." *Id.*

  **b.**  In this case, Jones does not argue, for example, that the protective sweep extended beyond the area "immediately adjoining" where he was arrested without the officers' reasonable suspicion that a person "posing a danger" to them was there. *Buie*, 494 U.S. at 334.

Jones challenges the two searches of his home that occurred *after* the protective sweep ended.

**c.**     Even if Jones did challenge the protective sweep, however, the record is clear that the sweep did not lead, directly or indirectly, to the recovery of any of the evidence Jones seeks to suppress in his motion. He seeks to suppress the three firearms to which he directed the officers and the physical evidence obtained after he signed the consent form. The searches leading to the recovery of these items occurred after, and apart from, the protective sweep of Jones's home. *See* (Findings of Fact 36–38, 56.) In other words, even if the sweep was deficient in some way under *Buie* (an argument Jones does not raise), it did not result, directly or indirectly, in the recovery of any "fruit" for suppression. *Cf. Buie*, 494 U.S. at 328 (explaining that *during* the protective sweep, an officer "noticed [the] red running suit" at issue in the suppression motion "lying in plain view on a stack of clothing and seized it"); *United States v. Howard*, — F. Supp. 3d —, No. 15-08, 2015 WL 6694106, at *1 (W.D. Pa. Nov. 2, 2015) (explaining that "[w]hile conducting a 'protective sweep' of the Residence after arresting Mr. Howard, the Task Force saw in plain view," and later seized, the heroin and drug paraphernalia at

issue in the suppression motion (emphasis added)).[8]

**14.** Third, the court concludes that the officers acted reasonably in the interest of safety in remaining in Jones's home immediately following his arrest and during the protective sweep.

      **a.** When executing an in-home arrest warrant, police officers have an "interest" in "taking steps to assure themselves that the house in which a suspect . . . has just been . . . arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Buie*, 494 U.S. at 333. This is so because "[t]he risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-

---

[8] Jones does not seek suppression of the cash and cell phone recovered from his pockets in the kitchen immediately following his arrest. In any event, a challenge to that evidence would be meritless.

    The Fourth Amendment permits law enforcement agents to conduct a warrantless search "incident to" a suspect's lawful arrest. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citing *Weeks v. United States*, 232 U.S. 383, 392 (1914)). This exception to the warrant requirement derives from "interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Id.* (citing *United States v. Robinson*, 414 U.S. 218, 230–34 (1973); *Chimel v. California*, 395 U.S. 752, 763 (1969)). A warrantless search incident to arrest "may only include 'the arrestee's person and the area within his immediate control—[*i.e.*,] the area from within which he might gain possession of a weapon or destructible evidence.'" *Id.* (quoting *Chimel*, 395 U.S. at 763). Because *Payton* permits officers to execute an arrest warrant inside a suspect's home, law enforcement agents may conduct a limited search of the arrestee's person incident to his or her arrest while inside the person's home. *See Buie*, 494 U.S. at 336 ("[T]he justifiable search incident to an in-home arrest [cannot] extend beyond the arrestee's person . . . ." (citing *Chimel*)).

    Here, Agent Johns searched Jones's pockets in the kitchen after his arrest and recovered the cash and cell phone. (Finding of Fact 33.) In other words, the search of Jones's person was incident to his lawful in-home arrest, *see Gant*, 556 U.S. at 763; *Buie*, 494 U.S. at 336, rendering it reasonable under the Fourth Amendment. Consequently, this evidence is not subject to suppression.

street or roadside investigatory encounter." *Id.* "[U]nlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.'" *Id.* "An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.*

**b.**     The Fourth Amendment does not require that "every police action" in execution of an arrest warrant "inside a home" be "explicitly authorized by the text of the warrant." *Wilson v. Layne*, 526 U.S. 603, 611 (1999). It merely "require[s] that police actions in execution of a[n] [arrest] warrant be *related to the objectives of* the authorized intrusion." *Id.* at 611 (emphasis added); *id.* at 614 (holding that "it is a violation of the Fourth Amendment for police to bring members of the media . . . into a home during the execution of a[n] [arrest] warrant when the[ir] presence . . . was not *in aid of* the execution of the warrant" (emphasis added)); *United States v. Meindl*, 83 F. Supp. 2d 1207, 1215–16 (D. Kan. 1999) (applying *Layne*).

**c.**     In this case, taking Jones into the kitchen immediately after his arrest and during the protective sweep was a reasonable precautionary "step[]" that assisted the officers in "assur[ing] themselves" that Jones's home was not "harboring other persons who [were] dangerous and who

could [have] unexpectedly launch[ed] an attack" against them. *See Buie*, 494 U.S. at 333. In reaching this conclusion, the court credits Detective Flaherty's consistent testimony showing that one of the "objectives of the authorized intrusion" into Jones's residence, *Layne*, 526 U.S. at 611, was the safety of the officers and the occupants of the home during the execution of the arrest warrant. *See* (Finding of Fact 61.)

**d.** Apart from Jones—a suspect who the officers knew had a prior felony-drug conviction and was indicted for a serious federal drug-trafficking conspiracy offense—the officers did not know who else, if anyone, was inside Jones's home or if he or she (or they) had weapons or the intent and capacity to attack the officers. *See, e.g.*, (ECF No. 1083 at 87, 102, 109 (Detective Flaherty testifying that (1) "[w]e . . . didn't know there wasn't someone upstairs with a firearm," (2) "as law enforcement we are concerned [for our safety] every time we go through a door and don't know what's on the other side," and (3) he agreed that the moment before entering Jones's home was "tense").) To adopt Jones's position that police officers must immediately turn their backs on a potentially dangerous and unfamiliar in-home arrest scene and remove the arrestee from the home would subject those officers to serious and unnecessary risks. *See Buie*, 494 U.S. at 333 (discussing the dangers of executing an

in-home arrest warrant and the "disadvantage of being on [the arrestee's] 'turf'").  In this case, the officers did not know, for example, if someone was on the second floor of Jones's home or in the attic with a weapon ready to launch an attack at the officers.  No threat materialized—but that does not render the officers' precautionary measure unreasonable under the Fourth Amendment.  *See Howard*, — F. Supp. 3d at —, 2015 WL 6694106, at *10 (noting that the threat of "lawless individuals who . . . prepare to harm officers after their companions peacefully surrender is the *very* evil against which *Buie* protects" (emphasis in original)).  In view of the totality of the circumstances of this case, it was reasonable in the interest of safety for the officers, during the protective sweep, to remain in the home with Jones after his arrest.

    **e.**       Jones argues that the officers' legal right to remain in his home expired the instant the protective sweep ended.  In the abstract, this is correct.  *Buie*, 494 U.S. at 335–36 ("The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and . . . to complete the arrest and depart the premises.").  In this case, however, the preponderance of the evidence establishes that *during* the protective sweep, Jones was searched incident to his arrest in the kitchen and found

to possess a cell phone and more than $3,000.00 in cash.[9] These items were collected and catalogued, which took a "few minutes." More importantly, though, the discovery of a large quantity of cash in Jones's possession logically prompted Detective Flaherty's first request for consent to search the residence, especially in light of the serious drug-trafficking offenses for which Jones was indicted in this case. *Cf. United States v. $67,220.00 in United States Currency*, 957 F.2d 280, 285 (6th Cir. 1992) ("[C]arrying a large sum of cash [can be] strong evidence of some relationship with illegal drugs."); *see* (ECF No. 228 (charging Jones with involvement in trafficking five or more kilograms of cocaine, 500 grams or more of methamphetamine, and one kilogram or more of heroin).) By a preponderance of the evidence, the record shows that Detective Flaherty's first request for consent also occurred *during* the protective sweep. *Compare* (Finding of Fact 31 (the protective sweep lasted "approximately a few minutes" after the forced entry)), *with* (Finding of Fact 34 (the first request for consent occurred "less than five minutes [*sic*]" after the forced entry).) Detective Flaherty's first request for consent began a permissible discussion between Jones and the officers about whether he would consent to a search of his home. *Cf.*

---

[9] This search was lawful. *See supra*, note 8.

*Schneckloth*, 412 U.S. at 232 ("The circumstances that prompt the initial request to search may develop quickly or be a logical extension of investigative police questioning. The police may seek to investigate further suspicious circumstances or to follow up leads developed in questioning persons at the scene of a crime."). The court is unaware of, and neither party points to, any authority indicating that the Fourth Amendment prohibits law enforcement officers from asking a suspect to consent to a search after his lawful arrest in the home and during a protective sweep.[10]   *Cf. id.* at 231–32 ("Consent searches are part of the

---

[10] Jones does not—and cannot—argue that requesting consent for a search, standing alone, violates the Fourth Amendment. The Supreme Court has observed that "[p]olice officers act in full accord with the law when they ask citizens for consent" to a search. *United States v. Drayton*, 536 U.S. 194, 207 (2002); *id.* ("In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own . . . . It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion."); *accord United States v. Whisenton*, 765 F.3d 938, 942 (8th Cir. 2014) ("[A]n agent does not violate the Fourth Amendment by merely requesting consent to search . . . ."); *United States v. Carter*, 573 F.3d 418, 427 (7th Cir. 2009) ("[T]he police do not need a good reason to request permission to search someone's home . . . . Their motivation is essentially irrelevant because the person asked can always refuse to grant consent and stop the search." (citing *United States v. Liss*, 103 F.3d 617 (7th Cir. 1997))).

   A police officer's request for consent is not an interrogation invoking a suspect's Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), for the simple reason that the giving of consent is not a self-incriminating statement. *See Schneckloth*, 412 U.S. at 232 (explaining that requesting consent is "far removed from 'custodial interrogation' where, in [*Miranda*], we found that the Constitution required now familiar warnings as a prerequisite to police interrogation," and observing that "in language applicable to the typical consent search, we refused to extend the need for warnings [in *Miranda*] . . . ." (citing *Miranda*, 384 U.S. at 477–78)); *United States v. Stevens*, 487 F.3d 232, 243 n.3 (5th Cir. 2007) (collecting decisions).

   For these reasons, it was permissible for the officers to ask Jones to consent to a search in this case.

33

standard investigatory techniques of law enforcement agencies. They normally occur on the highway, or in *a person's home* or office, and under informal and unstructured conditions." (emphasis added)).

**15.** For these reasons, the officers' conduct in remaining in Jones's home after his arrest and during the protective sweep does not warrant suppression in this case.[11]

## 2. Whether Jones consented to the first search for the three firearms

**16.** Jones argues that the officers violated his Fourth Amendment rights by searching for and recovering the two handguns and rifle to which he directed them without a warrant or his consent.

**17.** By a preponderance of the evidence, the government proved that Jones impliedly consented to the limited search for, and recovery of, the two handguns and rifle by providing the officers specific directions to their locations in his dining room closet and master bedroom. Suppression of these three firearms is not warranted.

---

[11] The court notes that the government's reliance on *Segura v. United States*, 468 U.S. 796 (1984), is somewhat misplaced. There, government agents entered the defendants' apartment with probable cause, but without an arrest or search warrant, and remained there for nineteen hours while other officers sought and awaited the approval of a search warrant in good faith. *Id.* at 799–801. The Court held that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence *while a search warrant is being sought in good faith* is not an unreasonable seizure under the Fourth Amendment. *Id.* at 788, 810. It is undisputed that after Jones signed the consent form, the officers never sought a search warrant for Jones's home. *Segura* is, therefore, inapposite.

18.     Where a defendant directs law enforcement agents to the specific locations of firearms by statements or gestures, courts have found that those statements or gestures qualify as implied consent to a limited search for, and retrieval of, those firearms.

19.     For example, in *Wilson*, police responded to a domestic disturbance call at an apartment building where the defendant allegedly brandished a handgun. 914 F. Supp. 2d at 553. The defendant was apprehended and placed in the rear of a police vehicle. *Id.* at 554. Without issuing *Miranda* warnings, the police questioned the defendant calmly about whether he possessed firearms and, if so, where they were located. *Id.* at 555, 566. In response, the defendant provided the officers "specific directions to where the weapons were concealed" by stating, "'look in the bin [in my room;] once you dig everything out at the bottom of the bin you'll find three handguns[;] one is totally fake[,] [and] all of them are broke.'" *Id.* at 556–57, 566 (quoting the defendant's testimony). Following these directions, the officers recovered one imitation pistol and two real handguns from the bin to which the defendant had directed them. *Id.* at 557. After the defendant was charged with various weapons offenses stemming from the search, he moved to suppress the firearms under the Fourth Amendment. *Id.* at 552.

20.     The district court in *Wilson* concluded that the defendant voluntarily consented to the limited search for, and seizure of, the firearms because "a 'typical

reasonable person' would have understood [the defendant's] statements to the officers as granting them his implied consent to . . . search the bin at the foot of his bed for guns." *Id.* at 565–67 (quoting *Jimeno*, 500 U.S. at 251).

21.     Similarly, in *United States v. Simmons*, police entered an apartment at the invitation of the defendant's roommate who alleged the defendant brandished a "shiny silver handgun" during an argument.  861 F. Supp. 2d 307, 309 (S.D.N.Y. 2012), *aff'd*, 543 F. App'x 101 (2d Cir. 2013).  Police questioned the defendant about whether he possessed a firearm, to which he replied, "'Yes, I do [have a gun] in my room . . . .  It is in the room on the chair by my bed under the papers.'"  *Id.* at 310.  The police retrieved the handgun from the specific location the defendant provided, and the defendant was charged with weapons offenses.  *Id.* at 308.

22.     In denying the defendant's motion to suppress the handgun, the district court in *Simmons* found that the defendant consented to its seizure: "[The defendant] voluntarily consented to the seizure of the weapon[,] . . . as he told the police exactly where the weapon was located."  *Id.* at 311.

23.     Finally, in *United States v. Candella*, the defendant was suspected of transporting firearms across state lines.  469 F.2d 173, 174 (2d Cir. 1972).  Government agents arrested the defendant at his home and asked him if he possessed any of the firearms he was accused of transporting.  *Id.*  In response, the defendant said, "'[s]ome of them are there,'" pointing to a carton "about five feet

or so from where he was standing." *Id.* The officers looked in the carton, found nineteen firearms, and asked the defendant "whether he had any others." *Id.* "[H]alf turning," the defendant responded by "indicat[ing] [to] a desk or other piece of furniture some five feet away from him in another direction." *Id.* The officers looked in the desk and found ten more firearms. *Id.*

**24.** The district court in *Candella* granted the defendant's motion to suppress the weapons, but the court of appeals reversed because

> [the defendant's] conduct when he was arrested constituted consent to the seizure of the handguns . . . . [The defendant], after being informed of his rights,[12] pointed to the exact spots where the guns were located and told the officers where they were . . . .
>
> [I]n practical effect [the guns] were in 'plain view' of the agents. The agents were legally in [the defendant's] home for the purpose of making an arrest for which they had a valid arrest warrant. Their attention was directed by [the defendant] to the very spot where the guns were situated. If the containers had been open there would be no doubt about the propriety of the seizure. [The defendant's] statement that the guns were in the containers was the equivalent of his opening the containers for the agents' inspection . . . . Here, once the [defendant] told the agents where the guns were, they were no longer concealed and it was reasonable for the agents to seize them.

*Id.* at 174–75 (internal citations and quotation marks omitted).

**25.** In this case, the record credibly establishes that Jones directed the officers to the specific locations of the two handguns and rifle in his dining room

---

[12] In this case, the officers did not issue Jones *Miranda* warnings before discussing the firearms he had in his home. For the reasons explained in Conclusion of Law 29, this fact does not provide grounds for suppression of the three firearms in this case.

closet and master bedroom without hesitation or coercion of any kind.  *See*

(Findings of Fact 34–35.)  Detective Flaherty testified as follows:

> Q. Upon first asking Mr. Jones for consent, what was his response?
>
> A. His response was, I have some guns in the residence, I am allowed to have them.
>
> Q. With that response, did you once again ask for consent?
>
> A. I responded, okay, can we have consent to search the residence?
>
> Q. Then what was his response at that point?
>
> A. I'll tell you where they're at.
>
> Q. Did you ask him if it was okay for you to go get those guns?
>
> A. I told him we would like to secure the firearms, and he agreed.
>
> Q. So did he direct you to specific firearms or specific locations?  How did that go at that point?
>
> A. He directed us to three specific locations.  One of which was a dining room closet, which was the room right next to us [in the kitchen].  [Another officer] . . . located a firearm on a shelf in that closet.  And . . . Agent Johns and I went upstairs and recovered [a] SKS assault style rifle from the master bedroom closet, as well as a semi-automatic pistol from the left drawer of a long dresser.
>
> . . .
>
> A. By him telling us where [the three guns] were, he told us that one's in this drawer, one's in this closet.  So he obviously knew we were going to open a drawer to find the gun that he knew we

were securing.

(ECF No. 1083 at 62–63, 119.)    Jones's testimony corroborates Detective

Flaherty's account of this discussion in all relevant respects:

> A.    Agent Flaherty, he asked me were there any weapons in the house.[13]    I told him, yeah, there's [*sic*] guns there.  He said where are they at?  I said, they are allowed to be there.  He said, okay, well, where are they at?  Then I told him where the three guns were.
>
> . . .
>
> Q.    You did, according to what you just told us, inform them of location of guns, correct?
>
> A.    Yes.

(ECF No. 1108 at 12–14.)

**26.**    After considering the "totality of the circumstances," *Price*, 558 F.3d

at 277–78, the court concludes that "a 'typical reasonable person'" would have

understood Jones's specific directions to the locations of the three firearms, and his

subsequent agreement to their recovery, as his implied consent to a search for and

retrieval of them.    *Cf. Wilson*, 914 F. Supp. 2d at 565–67 (quoting *Jimeno*, 500

U.S. at 251); *Simmons*, 861 F. Supp. 2d at 311; *Candella*, 469 F.2d at 175 ("[The

defendant's] statement that the guns were in the containers was the equivalent of

his opening the containers for the agents' inspection.").    Jones's failure to say, "I

---

[13]    As explained in note 12, *supra*, see Conclusion of Law 29 for a discussion about the propriety of discussing weapons with a suspect before issuing *Miranda* warnings.

consent to the search for, and retrieval of, the three firearms," is not dispositive. *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981) ("[A] search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'"); *United States v. Grant*, 375 F. App'x 79, 80 (2d Cir. 2010) (same); *Harajli v. Huron Twp.*, 365 F.3d 501, 506 (6th Cir. 2004) (same); *Seifert v. Rivera*, 933 F. Supp. 2d 307, 316 (D. Conn. 2013) (same); *United States v. Pollaro*, 733 F. Supp. 2d 364, 369 (E.D.N.Y. 2010) (same).

27.     At the time of his arrest, Jones was a 32-year-old man with an associate's degree who owned five properties, including his own home. He had an extensive history of interaction with law enforcement and the criminal justice system dating back to when he was 15 years old. In other words, Jones was sufficiently intelligent and experienced with law enforcement officers to know that he was directing the officers to the specific locations of the three firearms in his residence and agreeing to their retrieval. *See Price*, 558 F.3d at 277–78 (factors to consider are "the age, education, and intelligence of the subject").

28.     Jones and Detective Flaherty credibly testified that Jones admitted there were firearms in his home and described their exact locations without hesitation in response to Detective Flaherty's brief questioning. That questioning occurred within approximately five minutes of the forced entry. *Id.* (factors to

consider are "the repetition or duration of the questioning" and "the length of the encounter"). Jones does not allege he was coerced into describing the locations of the three firearms. Even if he did allege coercion, his history of interaction with law enforcement and the criminal justice system for drug and weapons offenses undercuts the suggestion that he was intimidated to the point of coercion by Detective Flaherty's brief, matter-of-fact questioning in his own kitchen. No "physical punishment" was used against Jones, *Price*, 558 F.3d at 277–78, who surrendered to the officers near the front entryway without incident and does not allege physical abuse of any kind directed toward him or his family. *See, e.g.*, (ECF No. 1083 at 68 (Detective Flaherty testifying that "Jones was clearly not happy that we were there, but he was respectful. Everything was calm. There was no yelling or screaming by law enforcement or by [Jones] and his family. It was a pretty calm interaction.").) By that point, Detective Flaherty had "holstered [his] firearm." (Finding of Fact 27.) Jones did not testify that any officer pointed a weapon at him during Detective Flaherty's questioning. In addition, Agent Johns had already recovered more than $3,000.00 in cash from Jones's pockets. Jones did not object to the search for the three firearms in any way at any time.[14] These

---

[14] Courts have found that a failure to object to a search may support a conclusion of voluntary consent. *See, e.g.*, *United States v. Mitchell (Two Cases)*, 607 F. App'x 596 (8th Cir. 2015); *United States v. Lopez*, 547 F.3d 397 (2d Cir. 2008); *United States v. Padilla*, 242 F.3d 378 (8th Cir. 2000) (non-precedential opinion); *United States v. Gonzalez*, 205 F.3d 1338 (5th Cir. 1999); *United States v. Woods*, 104 F.3d 360 (4th Cir. 1996) (non-precedential opinion); *United States v. Valencia*, No. 12-30, 2012 WL 3104847 (D. Neb. July 30, 2012); *United States*

factors support the conclusion that Jones made a calculated and voluntary decision to inform the officers about the locations of the three firearms and to agree to their retrieval. In other words, Jones voluntarily consented to the first search.

**29.** The officers did not issue Jones *Miranda* warnings before discussing the firearms present in his home. Under *Miranda*, 384 U.S. 436, a defendant's unwarned *statements* made during a custodial interrogation are inadmissible at trial under the Fifth Amendment's Self-Incrimination Clause. The Fourth Amendment, however, does not require suppression of *physical* evidence recovered as a result of unwarned but voluntary statements. *United States v. DeSumma*, 272 F.3d 176, 177 (3d Cir. 2001) ("[S]uppressing [physical] evidence derived from a voluntary but unwarned confession serves neither the goal of deterring coercive police misconduct nor the purpose of ensuring trustworthy evidence."); *United States v. Latz*, 162 F. App'x 113, 118 (3d Cir. 2005) (holding that the Supreme Court's plurality decision in *United States v. Patane*, 542 U.S. 630 (2004), "validates *DeSumma*" through Justice Thomas's opinion and Justice Kennedy's concurrence). In *DeSumma*, the Third Circuit Court of Appeals explained the difference between the Fourth Amendment and *Miranda* exclusionary rules:

> In *Wong Sun*, narcotics agents arrested the defendants in their homes without probable cause or reasonable grounds. *Wong Sun*, 371 U.S. at 473–78. The Supreme Court held that because Fourth Amendment

---

*v. Kopf*, No. 10-183, 2010 WL 2545350 (E.D. Mo. May 27, 2010), *R&R adopted*, 2010 WL 2545374 (E.D. Mo. June 21, 2010).

violations had occurred, the evidence stemming from those arrests must be excluded from the trial as "fruit of the poisonous tree." *Id.* at 488.

The defendant in [*Oregon v. Elstad*, 470 U.S. 298 (1985)] gave an incriminating statement before receiving *Miranda* warnings. *Elstad*, 470 U.S. at 300–01. Later, after having been advised of his *Miranda* rights, defendant gave a written statement that was introduced at trial. *Id.* at 301–02. The Supreme Court rejected the defendant's contention that the second confession was the fruit of the poisonous tree. *Id.* at 308. The Court explained that the purpose of the Fourth Amendment's exclusionary rule is "to deter unreasonable searches, no matter how probative their fruits." *Id.* at 306 (emphasis added). The *Miranda* exclusionary rule, in contrast, serves the Fifth Amendment and applies more broadly than the Amendment itself. *Id.* Thus, a voluntary statement that would be admissible under the Amendment may be barred because of the lack of a *Miranda* warning.

The Court explained that the Fifth Amendment bars the prosecution from using compelled testimony in its case in chief because the failure to administer *Miranda* warnings creates a presumption of compulsion. *Elstad*, 470 U.S. at 306–07. Consequently, even unwarned voluntary statements are excluded from evidence. *Id.* at 307. The Court continued, however, "the *Miranda* presumption . . . does not require that the statements and their fruits be discarded as inherently tainted." *Id.* at 307. A defendant whose confession is inadmissible may not "enjoy the freedom to 'deny every fact disclosed or discovered as a "fruit" of his confession' . . . ." *Id.*; *see also Harris v. New York*, 401 U.S. 222, 225 n.2 (1971) (rejecting defendant's request to suppress such evidence as an "extravagant extension of the Constitution").

*Elstad* emphasized that "[v]oluntary statements remain a proper element in law enforcement" and admissions of guilt, "if not coerced, are inherently desirable." *Elstad*, 470 U.S. at 305 (internal quotations and citations omitted). The element of police misconduct is not a factor that comes into play when the prosecution uses a voluntary statement.

Applying the *Wong Sun* fruits doctrine where the evidence is obtained as the result of a voluntary statement, would be inconsistent with

deterring improper police conduct and the goal of assuring trustworthy evidence.  *Id.* at 308.  No constitutional violation occurs in such a situation unlike the circumstances where an unreasonable search occurs or a coerced confession is obtained . . . .

We hold that the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued.

*DeSumma*, 272 F.3d at 179–80.  Under *DeSumma*, therefore, the officers' failure to warn Jones under *Miranda* before questioning him is not a ground for suppression of the three firearms recovered in this case.[15]  *See id.* at 180; *Wilson*, 914 F. Supp. 2d at 562 & n.15, 566 n.18.

**30.**    In light of Jones's extensive history of interaction with law enforcement and the forthrightness with which he described the exact locations of the three firearms in response to Detective Flaherty's brief, noncoercive questioning, the officers' failure to warn Jones of his *Miranda* rights before asking him about the weapons does not render his consent to a search for them involuntary under the Fourth Amendment.  *Price*, 558 F.3d at 277–78 ("Factors to consider include . . . whether the subject was advised of his or her constitutional

---

[15]  Because Jones's statements to police regarding the locations of the three firearms were self-incriminating and made before the officers issued *Miranda* warnings, they may be inadmissible in the prosecution's case-in-chief at trial under *Miranda*.  *See Wilson*, 914 F. Supp. 2d at 566 n.18.  Jones, however, does not argue for suppression of these statements in his motion—*see* (ECF No. 919 ¶ 23.e (requesting that the court suppress only *physical* evidence as a result of any putative *Miranda* violation, which runs counter to *DeSumma*, 272 F.3d 176, as explained above))—and he did not raise this matter further in his proposed findings of fact and conclusions of law or reply.  In the absence of Jones's request for suppression of these statements and briefing on this issue by the parties, the court declines to rule on this matter at this stage.

rights . . . .").

**31.** The circumstances of this case show that Jones freely and voluntarily consented to the search for, and seizure of, the three firearms in issue. Suppression of these three firearms is not warranted.

### 3. Whether Jones voluntarily signed the consent form for the second search

**32.** Jones argues that the second warrantless search of his home after he signed the consent form violated the Fourth Amendment because his consent was, under the totality of the circumstances, the product of duress and coercion and not voluntarily given. Specifically, Jones points to the statements of an unidentified officer that his family would be "sat" outside the home pending a search warrant if he did not consent.

**33.** After careful consideration of the record and relevant legal authorities, the court concludes that the government proved by a preponderance of the evidence that the officers did not coerce Jones to consent to the second search of his home. For the reasons explained below, his consent was freely and voluntarily given under the totality of the circumstances. Suppression of the physical evidence recovered after Jones signed the consent form is not warranted.

**34.** The facts of this case are distinguishable from decisions in which coerced consent was found to compel suppression of physical evidence.

**35.** In *United States v. Ivy*, three police officers arrived at the defendant's

home on a tip that a fugitive was there.  165 F.3d 397, 399 (6th Cir. 1998).  The officers did not have an arrest or search warrant, but the defendant voluntarily allowed them to enter the home.  *Id.* at 399, 401–02.  Once inside, the officers encountered two other men, the defendant's girlfriend, and their infant child.  *Id.* at 399.  After the officers asked one of the men for identification, he fled the scene and was apprehended.  *Id.*  The officers found crack cocaine in the man's possession and brought him inside the home, where they discovered additional crack cocaine on the floor.  *Id.*  Two more officers arrived on the scene.  *Id.*  Over the next hour and a half, the officers pressed the defendant and his girlfriend to sign a consent-to-search form with threats to arrest everyone present in the home and to take their child away.  *See id.* at 400.  The defendant eventually signed the form, after which the officers recovered narcotics and weapons from the home.  *Id.* at 399–400.

**36.**     The district court in *Ivy* denied the defendant's motion to suppress, but the court of appeals reversed on the following grounds:

> Given the overwhelming evidence of coercion and intimidation employed by the police in obtaining [the defendant's] signature on the consent form, we [conclude] that the Government did not meet its burden of proving . . . that [the defendant's] consent was voluntarily given.

> [T]he length of detention before consent is a significant factor in any voluntariness determination.  [Here,] approximately one and a half hours passed between the officers' initial request for consent and [the defendant's] ultimate decision to sign the consent form . . . .  [T]he

entire incident, from the police knocking at the front door until the end of [the defendant's] videotaped questioning, took from seven to eight hours.

The prolonged length of [the defendant's] detention is particularly significant in light of the nature of his detention. Among other things, the police officers used unlawful threats . . . to secure [his] consent . . . . [One officer] made statements to the effect that if [the defendant] did not sign a consent form, everyone in the house, including [his] girlfriend, . . . would go to jail, and that [their] child would be taken into government protective custody . . . . [The officer's] remarks . . . went far beyond a mere reference to the fact that he could obtain a [search] warrant. Rather, he explicitly stated that if [the defendant] did not sign the form, he would arrest [his] girlfriend and take away their small child . . . .

[A] police officer's statement that he will arrest an innocent relative or intimate friend of a suspect if the suspect does not submit to a search is an unacceptable means of obtaining consent.

In this case, [the officer] was uncertain as to [the girlfriend's] level of involvement, if any, in the drugs found on the premises when he stated he would arrest her . . . . [T]he statements made by [the officer] were not merely informative, but were specifically calculated to induce fear and apply pressure. The intimidating nature of [the officer's] statement is particularly striking when one considers that [the officer] not only threatened to arrest [the girlfriend], but also to take [the] child from their custody. Even if [the officer] was correct in that both parents were about to be arrested and taken to jail, there were supervision alternatives to state custody, such as having the child stay with a friend or relative. That [the officer] stated, unequivocally, that the child would go into government custody if [the defendant and his girlfriend] did not consent to a search indicates that [the officer] was not merely trying to provide [the defendant] with data upon which to base his decision to consent, but rather was attempting to overcome [the defendant's] resolution not to consent. [The officer's] threat to arrest [the girlfriend] and, especially, to take her child thus constituted an objectively improper police action, . . . significantly intensifying the coercive tenor of the request for consent.

Even more disturbing than [the officer's] foreboding statements are the actions the police took with regard to [the girlfriend] and her child while awaiting either consent or a warrant to search [the defendant's] house. The police handcuffed [the girlfriend], by her legs, to the kitchen table. At points during the hour and a half while police attempted to induce either [the defendant or his girlfriend] to sign a consent, the police took [her] child from her . . . . [A]ntagonistic actions by the police against a suspect's family taint the voluntariness of any subsequent consent.[16] This Court now finds that such hostile police action against a suspect's family is a factor which significantly undermines the voluntariness of any subsequent consent given by the suspect.

After an hour and a half of this situation—of police threats to arrest [the girlfriend] and take the child, of [the girlfriend] being shackled to a table, of the child being taken from his mother's arms, of repeated police solicitations for consent—[the defendant] finally acquiesced and signed the consent to search form . . . . [The defendant's] consent was not voluntarily imparted; his will was indeed overcome . . . . This Court is left with the definite and firm conviction that a mistake has been committed.

*Id.* at 402–04 (internal quotation marks and citations omitted).

**37.** In *United States v. Hurston*, eleven law enforcement agents arrived at the defendant's home at 5:00 a.m. to arrest him for questioning without an arrest warrant, a search warrant, or probable cause that he committed a crime. 12 F. Supp. 2d at 632, 635–36. The defendant's wife and her two young children, ages five and two, were also present in the home. *Id.* at 632. The officers knocked on the door and, after the defendant answered, immediately entered the home with

---

[16] To support this assertion, the court of appeals in *Ivy* cited to *United States v. Hurston*, 12 F. Supp. 2d 630 (E.D. Mich. 1998), and *United States v. Eggers*, 21 F. Supp. 2d 261 (S.D.N.Y. 1998). The court addresses these decisions in detail below. *See* (Conclusions of Law 37–40.)

their guns drawn to arrest the defendant. *Id.* Directly after entering, the officers discovered a firearm in plain view, fanned out for a full search of the home, and brought the defendant's wife into a room alone where they pressed her to sign a consent-to-search form. *Id.* at 633. She signed the form, but the district court found that she did so under duress from multiple officers and after a full search had already taken place. *Id.* at 637. The district court credited the following portions of the wife's testimony:

- she was "'screaming, . . . my babies are in the house [in their rooms]'" and "'[p]lease don't shoot'" as the officers approached her with their guns drawn and immediately began searching the home after entry;

- the officers "'made [her] go to the rear of the house, the family room,'" where they repeatedly asked her, "'where is the dope?'" and "'[w]here is the money at?'";

- she "'kept . . . begging [the officers] to call [her] aunt for [the] kids, and they would not let her'";

- when the officers gave her the consent form to sign, the police were "'tearing up the home'" at that time, and one of the officers told her, "'sign this [consent form] so we don't tear up your house,'" after which she felt "'scared'" because "'they had [her] children in the other room and would not let [her] see [the] kids, and would not tell [her] what was going on with [the defendant]'";

- in response to the question, "'[w]hy did you sign the form?,'" she stated, "'I didn't know what it was, and I was scared. I kept asking where the babies were. They said, I was upsetting them. They are okay. He is okay. He is making sure that they are all right, and they would not let me call anybody else. They would

49

not, I kept asking to call my aunt, and they would not let me call anybody else to find out what was going on'";

- she was "'[c]rying on the floor, praying'" during the search;

- she did not read the signed consent form, and it was not read to her; and

- the police did not let her contact family members to take the children until "after the first hour."

*Id.* at 637–38.

**38.** In concluding that the wife did not voluntarily consent, the district

court in *Hurston* reasoned:

The [wife's] "consent" occurred when eleven armed officers had already been searching her house from the time they entered. Her young children were crying, she was highly distressed, and . . . the police were threatening to wreck her house if she did not sign the consent . . . . [T]he officers refused her "begging" to allow her to call her aunt to pick up her young children . . . . [P]rior to [her] signing the consent form other officers were yelling through the house.

[T]he [5:00] a.m. armed search by [eleven] officers with firearms drawn was a startling, frightening experience for [the defendant's wife] and her two young children. The Court credits her testimony with regard to the shock value of the incident, and the Court further notes that there was no evidence of any significant intervening circumstance that would have allowed a rational voluntary consideration of the police request to search. There was conflicting testimony over whether the form was read to her, whether she read it, or whether it was merely placed before her and she signed it to stop the officers from tearing up her house . . . .

[Therefore,] the Court does not find a voluntary consent and [free] signing [of] the consent form [in this case] . . . .

*Id.* at 639–40 (internal quotation marks and citations omitted).

**39.**     In *United States v. Eggers*, a married couple charged with wire fraud

sought to suppress documents seized during the warrantless search of their home

on the ground that government agents coerced their consent.  21 F. Supp. 2d at

262.  Armed with arrest warrants, four federal agents arrested the husband at his

office, placed him in the backseat of their police vehicle, and proceeded to the

couple's home to arrest his wife.  *Id.*   The court described what transpired

thereafter as follows:

> At the time of her arrest [in the home, the wife] initially was very
> agitated and upset, a fact which was readily apparent to the agents.
> [The wife] led the agents into the office area, held up [a relevant] file,
> and flipped through it in front of [an agent] while protesting her
> innocence.  [The agent] seized the file from her and certain documents
> from her desk, despite [her] saying that she did not give him
> permission to do so.  Both [the husband and wife] expressed concern
> to the agents on several occasions regarding their children, [who were
> expected to come home from school shortly,] and [the wife] was
> permitted to make temporary arrangements for their care.  Later, [two
> agents] told her that the children would be allowed back in the house
> quickly if [the couple] consented to the search but would be prevented
> from returning to the premises for a day or two if they refused
> consent.
>
> [The agent], further, told [the wife] that [97] percent of people that the
> agents arrest are convicted, that she was facing a lot of jail time[,] and
> that she would be better off if she cooperated with the investigation.
> After she refused to consent, [and after the agent spoke with her
> attorney who told the couple not to consent, the agent] told her that
> she was "making a big mistake," making it harder on herself, and that
> "it's just going to be harder this way." [The agent] impressed upon
> [the wife] that he had seen lots of evidence of crime and that the
> agents would secure a warrant if she did not consent, a theme
> reiterated by [another agent] during the car ride [to the field office
> following their refusal to consent].   During the course of the ride

[downtown—and about thirty minutes into the ride—the wife]
expressed concern about the possible destructiveness of a warranted
search[—*i.e.*, that it would involve mattress slashing, destruction of
personal items, and so on]. While [the agent] said that her fears were
unfounded, he told her also that she "would know that a search was
conducted at her residence."

There is no doubt that the agents' initial efforts to obtain consent were
met with unequivocal refusal. That refusal was reinforced by [the
agent's] conversation with [the wife's] attorney. [The wife] persisted
in her refusal even after [the agent] then told [her] that she was
making it harder on herself and that her children would be locked out
of the house until a search was conducted . . . .

*Id.* at 269–70. Eventually, en route to the field office, the couple agreed to sign the

consent form after repeated discussions with the agents about how the execution of

a search warrant would affect their children and personal items. *Id.* at 264–66.

**40.** Based upon these facts, the district court in *Eggers* concluded that the

agents coerced the couple's consent, reasoning:

The issue . . . is whether it was objectively reasonable for the agents to
believe that the [the couple's] change of heart, en route to the . . . field
office while handcuffed and in custody, was the product of an
essentially free and unconstrained choice and not the result of duress
or coercion, express or implied. After considering the other
circumstances leading up to the consent, it is apparent that the agents'
conclusion that they possessed valid consent to search was not
objectively reasonable.

The agents knew that [the wife] was emotionally upset by the arrest in
her home by the armed agents. While she later calmed down
somewhat, the agents must have known that her equanimity was not
aided by statements such as "97 percent of the people that we arrest
are convicted" and that she was "in a lot of trouble," "facing a whole
lot of jail time" and "would be better off if [she] cooperated with" the
investigation. [One agent], moreover, told her that "if that is how you

want to do it, that is fine, but it's a big mistake. You are just going to make it harder on yourself. It's just going to be harder this way."

The impact of these circumstances was compounded by the [couple's] overtly manifested concern for the ability of their children to reenter the family home. The agents made clear that the children would be allowed in promptly if the [couple] consented to a search but otherwise would not be allowed back inside until after a search warrant was obtained and executed, which might take a day or two.

Finally, the agents were aware that the [couple] were concerned also that a warranted search would result in needless damage to their property. While [the agent's] words to some degree should have allayed that fear, he nevertheless should have been aware that his statement that [the wife] "would know that a search was conducted" could be considered by one in [her] position as ominous and threatening.

In all of the circumstances, the Court finds that the agents did not have a reasonable basis to believe that the [couple's] consent was voluntary. The objectively reasonable interpretation of the [couple's] ultimate decision to consent was that it resulted from the agents' threats that a warrant would issue, that the children would be locked out of the house until it was executed, and that the house or its contents could be damaged in the inevitable search. Although the [couple] were aware of a right to refuse based on their conversation with their attorney, knowledge of a right to refuse is but one factor to consider. And even a knowledgeable defendant's will eventually can be overborne by express or implied coercion.

As the agents should have known that the consent was not voluntarily given, the evidence seized . . . must be suppressed . . . .

*Id.* at 269–71 (internal quotation marks, footnotes, and citations omitted).

**41.** After carefully considering the "totality of the circumstances" in this case, *Price*, 558 F.3d at 277–78, the court concludes by a preponderance of the evidence that Jones's consent to the second search was not the "product of duress

or coercion, express of implied." *Schneckloth*, 412 U.S. at 227.

    **42.** By way of background, Jones testified consistently and straightforwardly about the unidentified officer's allegedly coercive statements as follows:

> [Detective Flaherty] slid . . . the white paper on the table. He said, sign this. I looked at it. I seen [*sic*], consent to search. And I thought, I am not signing that. I said, unless you get my lawyer on the phone and he says it's okay for me to sign it, then I am not signing anything else. The agent who had been talking to me the whole time said, well, if we have got to get your lawyer on the phone, then we will get our lawyer on the phone and while we wait for our lawyer to get the search warrant, we will sit your family outside. I said, you can't do that. He said, we can and we will. I said, you really [*sic*] going to sit my family outside? He said, try us. I said, damn, that's fucked up; and I signed the consent form.

(ECF No. 1108 at 23.)[17] The court credits Detective Flaherty's testimony that

---

[17] During cross-examination, Jones consistently described the statements as follows:

Q.    Tell us how the threat was made. What was said and how was it said?

A.    What do you mean? I told you what he said. Do you want me to say the same thing I said?

Q.    I would like you to explain not only what was said, but how it was said.

    . . .

A.    Agent Flaherty put the paper on the table. I looked at the paper. I seen [*sic*] it said, consent to search. I said, I am not signing this unless you get my lawyer on the phone and he says it is okay for me to sign that. Other than that, I am not signing anything. That's when he told me. He said, well, if we have got to get your lawyer on the phone, then we have got to get our lawyer on the phone. And while we wait for our lawyer to get a search warrant, then we are going to set your family outside. I said, you can't do that. He said, we can and we will. I said, damn, you [*sic*] going to put my family outside? He said, try us. I said, that's fucked up; and I

54

Jones signed the consent form within twenty minutes to an hour after the forced entry and that he did not observe or hear the unidentified officer make this statement to Jones.

**43.** The court notes that only two matters point toward coercion in this case. First, the officers did not read Jones his *Miranda* warnings. Jones, however, had extensive interaction with the criminal justice system, as previously explained. The second matter pointing toward coercion is the statement that Jones's family— which included his four minor children and premature infant son, MJ—would be "[sat] outside" pending a search warrant. The temperature outdoors near Jones's home was below freezing. MJ relied upon an oxygen machine visible to the officers. Jones knew the officers had enough incriminating evidence against him to procure a search warrant for his home (*i.e.*, the large sum of cash found in his pockets, the three firearms retrieved after his first consent, and the fourth handgun observed in the master bedroom), meaning he had little incentive to sign the consent form. Yet he did so after hearing the statement about "sitting" his family outside.

**44.** Other factors, however, convince the court by a preponderance of the evidence that Jones did not sign the consent form under coercion or duress.

---

signed the form. Excuse my language. And I signed the form.

(ECF No. 1083 at 59–60.)

**45.** First, according to Jones's, Andrews's, and Best's testimony, the unidentified officer stated, without further explanation, that "we will sit your family outside" pending a search warrant. While this may be construed as somewhat threatening, the statement is objectively ambiguous. The officer did not say, for example, that "we will sit your family outside in sub-freezing temperatures without any access to shelter, winter clothing, or other accommodations to ensure their wellbeing," as Jones insinuates in his filings.

**46.** Second, after hearing the officer make this statement, Jones did not seek, or even attempt to seek, clarification about, for example, whether his family would be able to stay with friends or family pending a search warrant; whether they would be able to dress appropriately or gather their belongings before exiting the home; whether they might be taken to a police station or allowed to await a search warrant in the officers' vehicles; or whether the officers would ensure that MJ was properly cared for if his family had to leave the home. His failure to even attempt to pursue more information about what the officer meant by "[sitting his] family outside" undercuts his assertion of coercion. According to Jones's testimony, he resisted signing the consent form through three brief statements: (1) "unless you get my lawyer on the phone and he says it's okay for me to sign it, then I am not signing anything else," (2) "you can't do that," and (3) "you really [*sic*] going to sit my family outside?" Following the officer's responses to these

statements of resistance (*i.e.*, "we can and we will," and "try us"), Jones capitulated and signed the form without further opposition (*i.e.*, "I said, damn, that's fucked up; and I signed the consent form").

      **a.**      In contrast to this case, the couple in *Eggers* repeatedly expressed concern about their children before any threats were made, unequivocally denied the agents consent to search their home multiple times, sought advice from their attorney about whether they should or should not consent, pursued detailed clarification from the agents about the effects of consenting versus the effects of awaiting a search warrant, and reflected individually and as a couple for a substantial amount of time before signing the consent form. 21 F. Supp. 2d at 262–65. Through all of this, the agents in *Eggers* held steadfastly to their assertions that the couple's daughters would be barred from entering the home for a day or more and their personal effects might be damaged during a search if they did not consent. *Id.* In other words, the agents' threats in *Eggers* were far more specific and calculated—and they were allowed to linger in the couple's minds for far longer, without qualification, even after persistent requests for clarification—than the statements directed toward Jones in this case.

**47.**    Third, the record does not establish that Jones had an objectively

reasonable basis upon which to conclude that the officers would force his family outside in sub-freezing temperatures without access to shelter, winter clothing, or other accommodations to ensure their wellbeing. Contrarily, the record demonstrates that such a conclusion would have been objectively unreasonable. Before this statement was made, the officers accommodated Jones's request to be taken out of the kitchen—*i.e.*, the "coldest room in [the] house"—into the dining room without hesitation. (Finding of Fact 41.) Also before this statement was made, an officer accommodated Andrews's request that she be allowed to go into the kitchen from the living room to make MJ a bottle, at which time she walked by Jones in the dining room. (Finding of Fact 43.) Other interactions suggest more broadly that the officers had no intention to harm Jones or his family. An officer traversed two flights of stairs to the attic to retrieve warmer clothes for Best at his request. (Finding of Fact 32.) Finally, Detective Flaherty testified credibly that the officers provided Jones additional accommodations after the search:

> Q. Prior to leaving the residence [after the second search,] was [Jones] given an opportunity to put more clothes on?
>
> A. I am sure we would have got him clothes to put on.
>
> Q. Is that a standard thing to do when you are arresting somebody in the wintertime if they are underdressed?
>
> A. Yes.

(ECF No. 1083 at 151.)

**48.** Fourth, the record shows that Jones was not under physical or mental duress when he signed the consent form. The parties' interaction was calm. There was no physical or verbal abuse.[18] He was taken into a warmer room, *i.e.*, the dining room, at his request. His wife and children were unrestrained in the living room, and while they could see Jones in handcuffs in the dining room, Jones voluntarily sacrificed the privacy of the kitchen by requesting that he be taken into a warmer room. Jones—who had an associate's degree in business and owned five properties—read the consent form, which expressly provided, "I have not been threatened, nor forced in any way," and "I freely consent to this search." Detective Flaherty gave Jones an opportunity ask questions after reading the form. The officers took Jones's handcuffs off to allow him to read and sign the form. Jones was not suffering from any observable medical conditions. He does not allege he was refused any request for food or drink. The record does not credibly establish that the officers pointed their firearms at Jones in the dining room or at his family in the living room.[19] In terms of the length of the interaction leading up to Jones's

---

[18] The court credits Detective Flaherty's testimony that the officers did not open Jones's safe to retrieve his engagement ring until after he signed the consent form. *See* (ECF No. 1083 at 64.) Detective Flaherty's testimony undercuts Jones's assertion that the officers brought the ring down to him and mocked him with it before he signed the consent form, which the court did not find credible. *See* (ECF No. 1108 at 22.)

[19] At the suppression hearing, Andrews suggested that the officers had their weapons pointed at her and the children in the living room for the duration of the incident. *See, e.g.*, (ECF No. 1107 at 32–33.) Best, however, testified that the officers were not brandishing their weapons in the living room. *See* (ECF No. 1108 at 80.) In light of this conflicting testimony, the

signing of the consent form, twenty minutes to an hour passed after the officers forced entry into the home, during which time the officers had already searched Jones's person and he had already consented to the first search for the three firearms.

      **a.**      In contrast to this case, the officers in *Ivy* threatened to arrest everyone in the home without legal or factual basis, handcuffed the defendant's girlfriend to a chair by her legs in front of him for one and a half hours, and repeatedly took the couple's child from his mother and threatened—without legal basis—to place him in government protective custody if the defendant did not consent to a search. *See Ivy*, 165 F.3d at 402–04.

      **b.**      Similarly, the officers in *Hurston* illegally entered the defendant's home without any warrant or probable cause, began "'tearing up the home'" immediately after entry, forced the defendant's wife into a room alone when she was visibly emotionally distraught, would not allow the wife to speak with her children or make accommodations for them to leave the home during the search, and allowed the wife to sign the form without reading it to her or ensuring that she read it for herself. *See Hurston*, 12 F. Supp. 2d at 632, 637–40.

---

court does not find Andrews's testimony credible.

**49.**     Fifth, and finally, the suggestion to Jones that the officers would seek a search warrant if Jones did not consent was not coercive, or incorrect, under the circumstances of this case.  The officers legally entered the home with an arrest warrant, seized more than $3,000.00 in cash from Jones's person incident to his arrest, recovered three loaded firearms from the home with Jones's voluntary consent, and observed other incriminating materials in plain view.  In sum, they would have had probable cause to secure a search warrant for Jones's residence if they applied for one.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

> **a.**     Under these circumstances, the representation to Jones that the officers would seek a search warrant if he chose not to consent did not constitute deceit or trickery, and it did not taint the voluntariness of his consent; it was a fair and sensible appraisal of the realities facing Jones. *See United States v. Henderson*, 437 F. App'x 96, 99 (3d Cir. 2011) (observing that where law enforcement agents have probable cause for a search warrant, the statement that "a search warrant could be obtained" without consent "[is] not coercive" because it "'accurately inform[s] [the suspect] of the current situation, and the possible outcome'" (quoting

*United States v. Henderson*, No. 06-234, 2010 WL 1565295, at *4 (M.D. Pa. Apr. 19, 2010); *United States v. Sebetich*, 776 F.2d 412, 425 (3d Cir. 1985))); *United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir. 1974) ("[T]he well founded advice of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion. There is an admission by the officer that he has no right to proceed unless the defendant consents. [This is] a fair and sensible appraisal of the realities facing the defendant . . . .").

50.    In sum, the "totality of the circumstances" of this case, *Price*, 558 F.3d at 277–78, does not suggest that Jones's consent to the second search was the "product of duress or coercion, express of implied." *Schneckloth*, 412 U.S. at 227. In light of the brevity of this matter-of-fact exchange, the calmness of the atmosphere, the officers' acquiescence to Jones's and Andrew's requests for accommodations, the absence of any fervent, resilient objections by Jones, and the time frame within which he gave his consent to the second search after the officers recovered the three firearms during the first search (*i.e.*, approximately twenty minutes to an hour after the forced entry), the court cannot conclude that Jones's "will [was] overborne by coercive police conduct" such that he "[lost] the capacity for self-determination." *See United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014). Consequently, suppression of the physical evidence recovered after Jones

signed the consent form is not warranted.

**51.**  Because Jones does not raise any other grounds for suppression of the

evidence recovered during the February 26, 2014 arrest and search,[20] the court will

deny his suppression motion.[21]

---

[20]  Jones does not challenge the search of the Acura car found in the rear of his home in his suppression motion.  *See* (Finding of Fact 59.)  The record indicates that after Jones signed the consent form, the keys to this vehicle were found inside the dresser in Jones's master bedroom.  (ECF No. 1083 at 143–44.)

[21]  The court notes that this case may implicate the inevitable discovery doctrine.  The parties did not brief this issue.  In *United States v. Allen*, 159 F.3d 832 (4th Cir. 1998), the United States Court of Appeals for the Fourth Circuit aptly described the inevitable discovery doctrine as follows:

> The Supreme Court first adopted the inevitable discovery doctrine in *Nix v. Williams*, 467 U.S. 431 (1984).  The Court held that information obtained by unlawful means is nonetheless admissible "[*i*]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444 (emphasis added).  In *Nix*, the police persuaded a criminal defendant to inform them where the body of a child the defendant had murdered was located.  *Id.* at 435–36.  The interrogation, which occurred after the defendant had been arraigned and had retained counsel, violated the defendant's right to counsel.  *Id.* at 437.  The Court concluded that if the government could prove that the evidence inevitably would have been discovered by legal means then "the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Id.* at 444.
>
> The police in *Nix* had established an extensive search for the child that was only two-and-a-half miles away from the location of the body when called off due to the defendant's statement.  The government introduced abundant evidence that the patrol team would have found the body "within a short time" had the search continued.  *Id.* at 437–38 (quoting the trial court).  After explaining that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment," *id.* at 444 n.5, the Supreme Court reviewed this evidence.  Agreeing with the express findings of the trial court, the Supreme Court concluded that the evidence demonstrated the body inevitably would have been found and so the trial court had properly applied the doctrine.  *Id.* at 448–50 . . . .
>
> The inevitable discovery doctrine may apply where additional routine or factually

## IV. CONCLUSIONS OF LAW FOR JONES'S SEVERANCE MOTION

1. As explained previously, Jones is charged at count 1 of the second superseding indictment with involvement in a cocaine, methamphetamine, and heroin trafficking conspiracy from in and around January 2011 to in and around September 2013 (the "Conspiracy Offense"). (ECF No. 705.)

2. Counts 3 through 5 of the second superseding indictment arise solely

---

established investigative steps would inevitably lead to discovery of the evidence without undertaking any search . . . .

The doctrine also may apply where the facts indicate another search inevitably would have occurred and would inevitably have uncovered the evidence, and that search falls within an exception to the warrant requirement. *See, e.g.*, *United States v. George*, 971 F.2d 1113, 1121–22 (4th Cir. 1992) (inventory search); *see also United States v. Cotnam*, 88 F.3d 487, 496 (7th Cir. 1996) (search incident to arrest).

The doctrine may even apply where the subsequent search that inevitably would have uncovered the disputed evidence required a warrant and the police had probable cause to obtain this warrant prior to the unlawful search but failed to do so, *if* the government produces evidence that the police would have obtained the necessary warrant absent the illegal search. Such evidence might include proof that, based on independent evidence available at the time of the illegal search, the police obtained and executed a valid warrant subsequent to that unlawful search, *see, e.g.*, *United States v. Whitehorn*, 813 F.2d 646, 648–50 (4th Cir. 1987); or took steps to obtain a warrant prior to the unlawful search, [*see, e.g.*], *United States v. Ford*, 22 F.3d 374, 377–79 (1st Cir. 1994); *United States v. Lamas*, 930 F.2d 1099, 1103 (5th Cir. 1991).

*Id.* at 838–39, 841–42.

In this case, Jones testified that he was told by an officer that they *would* seek an arrest warrant if he did not consent. Detective Flaherty's handwritten notes about the February 26, 2014 arrest list the name of the Assistant United States Attorney involved in the investigation. These facts may implicate the doctrine. *See id.* at 841 ("The doctrine may even apply where the subsequent search that inevitably would have uncovered the disputed evidence required a warrant and the police had probable cause to obtain this warrant prior to the unlawful search but failed to do so, *if* the government produces evidence that the police would have obtained the necessary warrant absent the illegal search."). Without this issue being briefed by the parties, the court declines to consider it at this time.

from the evidence gathered during the February 26, 2014 search of Jones's home, which occurred more than four months after the Conspiracy Offense is alleged to have concluded. At counts 3 through 5, Jones is charged with an individual cocaine and cocaine-base trafficking offense on or about February 26, 2014, possession of firearms in furtherance of that cocaine and cocaine-base trafficking offense on or about February 26, 2014, and possession of firearms after a felony conviction on or about February 26, 2014 (together, the "Post-Conspiracy Offenses"). (*Id.*)

3.      In his severance motion, Jones argues that the court should exercise its discretion to sever the Conspiracy Offense from the Post-Conspiracy Offenses and try them separately to avoid unfair prejudice against him. (ECF No. 915.)

4.      For the reasons that follow, the court agrees with Jones. His severance motion will be granted.

5.      Rules 8 and 14 set forth the relevant considerations for severance. Rule 8 authorizes joinder of charges if they are of a similar character, are based on the same act or transaction, or are part of a common scheme. Rule 14 provides the court discretion to order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires, if joinder of offenses appears to prejudice either the defendant or the government. *See Zafiro v. United States*, 506 U.S. 534, 538–39 (1993) ("Rule 14 . . . leaves the tailoring of the relief to be

granted, if any, to the district court's sound discretion."); *United States v. Walker*, 657 F.3d 160, 170 (3d Cir. 2011) (decisions under Rule 14 are reviewed for an abuse of discretion).

**6.** In this case, the Conspiracy Offense and Post-Conspiracy Offenses are arguably of a similar character under Rule 8. *Cf. United States v. Picklesimer*, 585 F.2d 1199, 1204 (3d Cir. 1978) ("[W]here a defendant is charged with narcotics conspiracy, evidence that weapons were found in his possession may be relevant and admissible."). The record shows, however, that the Conspiracy Offense and Post-Conspiracy Offenses are not sufficiently connected temporally or logically to support the conclusion that the crimes are part of the same transaction or plan. On its face, the second superseding indictment does not allege any connection between the Conspiracy Offense and the Post-Conspiracy Offenses. The Post-Conspiracy Offenses occurred more than four months after the Conspiracy Offense is alleged to have ended. There is no basis in the record to conclude that Jones possessed or sought to distribute the narcotics or used the firearms forming the basis of the Post-Conspiracy Offenses at any point during the alleged conspiracy.

**7.** If the Conspiracy Offense and Post-Conspiracy Offenses are tried together, the jury would learn that Jones was convicted of a prior felony for purposes of the felon-in-possession count. There is, therefore, a danger that Jones would suffer prejudice if these counts were tried together. "'[E]vidence of a prior

conviction has long been the subject of careful scrutiny and use at trial because of the danger that the jury might convict, not based on the evidence, but because it feels the defendant is a 'bad person.'" *United States v. Delatorre*, 522 F. Supp. 2d 1034, 1044 (N.D. Ill. 2007) (quoting *United States v. Singh*, 261 F.3d 530, 533–34 (5th Cir. 2001)), *aff'd sub nom. United States v. Benabe*, 436 F. App'x 639 (7th Cir. 2011); *see United States v. Hall*, 370 F.3d 1204, 1208 (D.C. Cir. 2004) (additional charges that were joined with a felon-in-possession count, charges for which a prior felony conviction was not an element of the offense, may unduly prejudice the defendant).

8.      If the Conspiracy Offense and Post-Conspiracy Offenses were tried together, the government would introduce evidence that Jones possessed five firearms to prove the Post-Conspiracy Offenses. There is, therefore, a danger that the jury would improperly convict Jones of the Conspiracy Offense on the basis of his possession of these firearms (one of which was an assault rifle). Evidence of firearm possession may be relevant and admissible to show, for example, intent to distribute narcotics as part of a conspiracy. *See* FED. R. EVID. 404(b)(2); *Picklesimer*, 585 F.2d at 1204 ("It often happens that . . . narcotic conspiracies . . . are ongoing ventures, requiring the use of guns for protection of the contraband[,] and in such a case, a weapon may be as much a tool of the crime as the van used to transport the narcotics."). At this stage of the prosecution, however, the

government failed to present evidence of any connection between Jones's possession of the five firearms recovered from his home on February 26, 2014 and the Conspiracy Offense. At the evidentiary hearing, the government submitted that one of its witnesses is prepared to testify that Jones possessed certain of the firearms found in his home on February 26, 2014 during the Conspiracy Offense. No evidence about this assertion was presented. Under these circumstances, the danger of prejudice counsels in favor of severance.

**9.** The court concludes that a joint trial of the Conspiracy Offense with the Post-Conspiracy Offenses would prejudice Jones. Accordingly, irrespective of whether the offenses were properly joined under Rule 8, the court exercises its discretion to sever the Conspiracy Offense from the Post-Conspiracy Offenses under Rule 14. Two separate trials will be held. First, the court will conduct a trial on the Conspiracy Offense. As soon as possible upon its conclusion, the court will empanel a new jury and conduct a trial on the Post-Conspiracy Offenses.

## V. CONCLUSION

For the reasons set forth in this opinion, the court will deny Jones's suppression motion and grant his severance motion.

An appropriate order follows.

**DATED**:     June 1, 2016

**/s/ JOY FLOWERS CONTI**
Joy Flowers Conti
Chief United States District Judge